UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL LUCAS, ET AL.,

    Plaintiffs,

v.

ULLIANCE, INC., ET AL.,

    Defendants.
_____/

Case No. 15-10337

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
R. STEVEN WHALEN

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY A CLASS [73]**

The Michigan legislature created the Health Professional Recovery Program ("HPRP") to ensure that healthcare professionals find treatment for mental health and substance abuse problems that could pose a risk to themselves or the public. State law requires Michigan's Department of Licensing and Regulatory Affairs ("LARA") to contract with a private entity to oversee the HPRP. LARA has entered into such a contract with Ulliance, Inc ("Ulliance").

Plaintiffs are health professionals who were reported by Ulliance as noncompliant with the HPRP. LARA summarily suspended each plaintiff's license after such report. Plaintiffs allege breach of contract against Ulliance. They allege violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against LARA and Carole Engle, the former director of the Bureau of Healthcare Service ("BHCS"), in her official capacity.

Plaintiffs move to form a class of similarly situated health professionals. For the reasons below, their motion will be denied.

**FACTUAL BACKGROUND**

LARA is a Michigan government agency that oversees the Bureau of Healthcare Services ("BHCS"), which regulates licensed health professionals. Defendant Engle was formerly Director of BHCS.

Michigan law authorizes disciplinary subcommittees to take disciplinary action against licensed health professionals on account of mental illness or substance abuse that may impair their ability to practice their professions in a safe and competent manner. See Mich. Comp. L. § 333.16221(a), (b)(ii)-(iii). LARA is authorized to investigate such grounds for disciplinary action and to provide the appropriate disciplinary subcommittee with an administrative complaint. Id. § 333.16221. The disciplinary subcommittee may proceed to impose sanctions, including suspension or revocation of the professional's license, subject to review by the Michigan Court of Appeals. Id. §§ 333.16226(1)-(2), 333.16237(6).

In addition to initiating disciplinary proceedings, LARA may summarily suspend a license, after consulting with the chair of the appropriate board or task force, if it finds that the public health, safety, or welfare requires emergency action. Id. §§ 333.16233(5), 24.292(2). If the licensee petitions for dissolution of the summary suspension, LARA must immediately request an expedited hearing before

an administrative law judge ("ALJ"). Mich. Admin. Code R. 792.10702(1). The ALJ must dissolve the summary suspension unless she finds that "sufficient evidence has been produced to support a finding that the public health, safety, or welfare requires emergency action and a continuation of the suspension order." Id. R. 792.10702(4).

Another option for health professionals struggling with mental illness or substance abuse is the HPRP, "a nondisciplinary, treatment-oriented program for impaired health professionals." Mich. Comp L. § 333.16105a. "Impaired" health professionals are those suffering from a current or immediate impending inability to practice in conformance with minimum standards due to "substance abuse, chemical dependency, or mental illness or . . . use of drugs or alcohol." Id. § 333.16106a.

The HPRP is under LARA's purview. Id. §§ 333.16104(3), 333.16165(1). LARA must "[e]stablish the general components of the health professional recovery program and a mechanism for monitoring health professionals who may be impaired." Id. § 333.16167(a). However, rather than manage the HPRP singlehandedly, LARA is required by statute to "enter into a contract with a private entity to act as a consultant to assist the committee with the administration of the health professional recovery program." Id. § 333.16168(1). LARA entered into such a contract with defendant Ulliance in September 2012. The contract requires Ulliance to follow HPRP policies and procedures approved by LARA.

LARA works in conjunction with Ulliance in executing its duties to "develop and implement criteria for the identification, assessment, and treatment of health professionals who may be impaired" and to "develop and implement mechanisms for the evaluation of continuing care or aftercare plans for health professionals who may be impaired." § 333.16167(b),(c). If LARA receives information from a LARA employee or contractor that purportedly establishes reasonable cause to believe that a health professional may be impaired, LARA must ask Ulliance to determine whether the health professional may be impaired. Id. § 333.16169(1). If Ulliance concludes that the health professional may be impaired, LARA may accept the professional into the HPRP if the professional acknowledges her impairment, voluntarily limits her practice as determined necessary by LARA, and voluntarily agrees to participate in a treatment plan that meets criteria developed by LARA (in cooperation with Ulliance). Id. § 333.16170(1).

Ulliance must "report immediately to [LARA] any circumstances known to the private entity that indicate that an impaired health professional may be a threat to the public health, safety, or welfare." Id. § 333.16168(2). If LARA determines, based on information received in such a report, "that the health professional involved may be a threat to the public health, safety, or welfare" and has violated certain articles of the Michigan Public Health Code or rules promulgated thereunder, LARA may proceed under statutory provisions authorizing investigation and the initiation

of disciplinary proceedings. Id. § 333.16169(2). LARA's contract with Ulliance requires a report of HPRP noncompliance "especially" where the noncompliance has a potential for placing patients or the public at risk. Further, LARA's HPRP manual, which Ulliance is contractually obligated to follow, requires Ulliance to report licensees to LARA during the HPRP intake process in certain circumstances. These circumstances include a licensee's refusal to undergo a required evaluation or, after an evaluation finds a licensee in need of treatment, to execute a monitoring agreement.

The four named plaintiffs in this suit were all HPRP participants who had their license suspended after being reported noncompliant. Plaintiff Tara Valpiando is a registered nurse and was referred to HPRP by an anonymous source. She was then ordered by the program to cease taking her prescription pain medication. After she refused, she was found noncompliant and reported to LARA. Her license was summarily suspended but restored by an ALJ after a hearing.

Plaintiff Scott Sanders is a registered nurse and was referred to HPRP after a DUI conviction. Two HPRP evaluators found that he did not have a substance abuse problem, and when Sanders refused to consult with a third HPRP evaluator, he was reported noncompliant and summarily suspended. An ALJ dissolved his suspension after a hearing.

Plaintiff Kelly Ann Schultz is a physician's assistant and was also referred to HPRP after a DUI conviction. She was reported noncompliant after failing to respond to a letter sent to the wrong address, and her licenses was summarily suspended. Again, an ALJ dissolved the suspension after a hearing.

Plaintiff Carol Lucas, a nurse, was referred to HPRP for mental health and substance abuse issues. She entered into a monitoring agreement, but she dropped out early and was reported as noncompliant. She was summarily suspended, but an ALJ dissolved the suspension after a hearing. Her license was suspended again, and remains suspended, after an appeal to the disciplinary subcommittee of the Board of Nursing.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on January 26, 2015, an Amended Complaint on January 30, 2015, and a Second Amended Complaint on May 5, 2015. [Dkt. 1, 3 & 29]. The Ulliance defendants moved to dismiss the case on April 3, 2015 and the state defendants moved for Judgment on the Pleadings on August 19, 2015 [19 & 38]. On March 31, 2016, the Court granted in part and denied in part Defendants' motions [62]. Plaintiffs' only remaining claim against the Ulliance defendants is for breach of contract. Their only viable claims against the state defendants are for violations of the ADA and the Rehabilitation Act.

Plaintiffs filed their Motion for Class Certification on July 1, 2016 [73]. The Court held that motion in abeyance on September 18, 2017, pending the resolution of motions for summary judgment [114]. On June 5, 2018, the Court denied those motions without prejudice, and a hearing was held on the class certification question on November 5, 2018.

**LEGAL STANDARD**

Before certifying a class, the Court conducts a "rigorous analysis" of the requirements of Fed. R. Civ. P. 23. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). The Court "has broad discretion in determining whether a particular case may proceed as a class action so long as it applies the criteria of Rule 23 correctly." *Cross v. Nat. Trust Life Ins. Co.*, 553 F.2d 1026, 1029 (6th Cir. 1977). The plaintiff, as the party seeking class certification, bears the burden of proof. *See In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Plaintiffs must factually prove that they meet the requirements of Rule 23.

> "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc…Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 374 (2011).

Despite the need for factual inquiries, the Court has elsewhere cautioned against reading *Dukes* as authorization to make early merits determinations.

> "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

The Court will therefore consider the factual basis for Plaintiffs' allegations only insofar as they implicate the requirements of Rule 23.

## ANALYSIS

**I.    The Proposed Class Action**

Plaintiffs' proposed class consists of "all persons who are, or were, participants in the HPRP program during the period of January 1, 2011 to the present." (Dkt. 73, pg. 20). The term "participants" should include all individuals "who entered into a monitoring agreement with HPRP, or who received license discipline as a result of non-compliance." (Id.). Plaintiffs maintain that the class size exceeds the 1,343 participants recorded by Ulliance. (Id. citing Dkt. #57 at pg. 3).

Plaintiffs also seek to certify a sub-class of healthcare professionals who were or are HPRP participants and who received summary suspension of their license between January 1, 2011 and the present because of LARA's purported policy that all health professionals that are deemed noncompliant by HPRP shall be suspended. (Id.). Plaintiffs use LARA's figures to number the subclass at 292 licensees. (Id. at pg. 20-21 citing Dkt. #30 at ¶ 65). The class action seeks redress for Ulliance's

alleged breaches of contract and LARA's alleged violations of the ADA and the Rehabilitation Act.

The Proposed Class Action's Claims against Ulliance

Plaintiffs seek to certify a class of all participants in HPRP who either signed a monitoring agreement or were sanctioned for noncompliance. Plaintiffs argue that the class is unified in that the whole class suffered from 1) being forced to undergo treatment with a provider they did not choose, 2) under a treatment plan that was dictated by Ulliance and not tailored to their individual needs, 3) under threat that their confidential information would be turned over to the state.

Plaintiff maintains that Ulliance breached its contract by failing to provide a full list of HPRP providers. The contract specifies that "a full list of approved providers must be available to a participant upon request." Contract § 1.022(B), Task 10, page 13. They allege that the director of HPRP had a policy of refusing to give this list to those who requested it, but it is unclear if any of the named plaintiffs requested such a list.

Plaintiffs also allege that Ulliance failed to tailor individual monitoring agreements in violation of its contract with the state. The contract between Ulliance and LARA states that the goal of the HPRP, among other things, is to "ensure[ ] that the monitoring agreement developed and agreed to between [Ulliance] and the licensee is tailored to their specific situation." Contract § 1.012(2). "The length of

monitoring must be consistent with the recommendation of the evaluator." Contract, § 1.031, pg. 17. Plaintiffs allege that Ulliance will overrule providers who do not recommend further treatment or monitoring and thereby subject the participants to needless and expensive treatment and monitoring, in violation of the contract.

Plaintiff produces an affidavit by Wesley Boyd, M.D. P.hD., a director of North Carolina's version of HPRP in 2014, that avers that Ulliance engages in the medical treatment of licensees, which it is contractually forbidden from doing. Policies such as restricting referrals, requiring minimum treatment, mandating drug testing for all participants, and restricting provider comments on the necessity of further treatment, all involve Ulliance making treatment decisions, in violation of its contract. (Pls.' Ex. B). Dr. Boyd also observes standard minimum treatments and standard treatment protocols that deviate from Ulliance's contractual obligation to individualize its treatment. (Id.).

Plaintiffs further allege that Ulliance revealed more information to LARA than was contractually permitted. The HPRP Policy and Procedure Manual provides for confidentiality but suspends these requirements for noncompliant participants.

> "When a health care professional comes to the attention of the HPRP and refuses to participate in the HPRP after all reasonable attempts have been made to encourage participation, the HPRP staff shall report the health care professional to the Allegation Section of [LARA] and forward all documents gathered in the intake process."

(Dkt. 19-3 pg. 9; Manual, § 101.00).

The Proposed Class Action's Claims against LARA

Plaintiffs allege that each member of the proposed subclass—HPRP participants whose licenses were suspended—suffered a suspension in violation of the ADA and the Rehabilitation Act.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) (quoting 29 U.S.C. § 794(a)). The Rehabilitation Act's sole-cause standard does not apply to ADA claims, however. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (2015). In order to make out a prima facie case of discrimination under the ADA, "plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the plaintiff must present evidence that animus against the protected group was a significant factor in the position taken by the [the defendants]." *Anderson*, 798 F.3d at 357.

Both causes of action thus require factual support that licensees' disability motivated the suspension of their licenses, not some other cause or causes. Plaintiffs seek to do this by alleging a policy of suspending non-compliant HPRP participants.

## II. Rule 23(a) Requirements

Fed. R. Civ. P. 23(a) provides as follows.

> "Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a).

The Court will not consider numerosity or adequacy of representation, because the class fails to establish commonality or typicality.

<u>Commonality</u>

Plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has interpreted this to require, in the discrimination context, that the defendant engage in a pattern or practice of discrimination, for "the crux of the inquiry is the reason for a particular employment decision." *Dukes*, 564 U.S. 338, 352. A class cannot aggregate victims of thousands of individual decisions unless those decisions were all motivated by a common pattern or practice. That discrimination may result from managerial discretion is not sufficient to constitute a class, but "a common mode of exercising discretion" may demonstrate commonality. *Id.* at 357. Though this case is not entirely a discrimination case like *Dukes*, the core of the case relies on similar allegations of systematic action: that 1) Ulliance systematically denied its patients of their third-

party beneficiary contractual rights and 2) LARA systematically suspended licensees who dropped out of HPRP.

Plaintiff has not made an adequate showing on either of these grounds. There are significant differences between the four named plaintiffs as to who dropped out at which stage of the HPRP and therefore who was governed by which contract provisions. Only Plaintiff Lucas, for instance, was governed by the monitoring agreement, and, as the three other named plaintiffs demonstrate, not all of those who were suspended after dropping out of the HPRP took part in the monitoring agreement. None of the four named plaintiffs had asked for the list of evaluators, and there is no indication that the class members will have a common claim out of the list of evaluators, for the contract specifies that the list will be available upon request, not as a matter of course. Contract § 1.022(B). Similarly, whether Ulliance was contractually obligated, or forbidden, from sharing participant's information with LARA will depend on the extent to which the information was pertinent to the licensee's ability to perform their work, and on the extent and type of the information shared. M.C.L. § 333.16168(2). These are idiosyncratic and particularized questions that are ill-suited to a common answer.

There would also be an irony to certifying a class of individuals whose principle claim is that Ulliance failed to individualize treatment plans. To the extent that HPRP participants have a breach of contract claim against HPRP, those claims

will vary based on where in the program the individuals were and what their contractual rights were at those specific stages in the program. Different stages of the HPRP are governed by different provisions of the contract, but Plaintiffs seek to aggregate claims that derive from both the evaluation stage and the monitoring stage, for instance.

Plaintiffs cannot make a showing of a systematic and unified breach of contract by Ulliance against the class members, because the class members' rights and injuries would implicate different provisions of the contract for different reasons. Such variable claims are not suited to class-wide resolution because they would each require their own proof.

> "What matters to class certification…is not the raising of common 'questions' -- even in droves -- but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Dukes*, 564 U.S. at 350 (citing Richard A. Nagareda, "Class Certification in the Age of Aggregate Proof," 84 N. Y. U. L. REV. 97, 132 (2009).

As to LARA, there can be no charge of a systematic discrimination against disabled individuals. Dr. Candilis has unequivocally denied that there exists "a LARA policy that summarily suspends program participants for non-compliance alone." (Dkt. 97-4 ¶ 40). Non-compliant licensees are evaluated at multiple levels by LARA decision-makers, from analyst to manager to division director to board chair. (Id. at ¶ 37). The administrative complaint is filed along with the summary

suspension to lay out the facts on which the decision-makers based their decision. (Id.). Between September 2012 and December 2015, 292 nurses were reported as noncompliant, but 88 did not have their licenses summarily suspended. (Id. at ¶ 36). Plaintiffs do nothing to dispute Dr. Candilis' characterization of the summary suspension process as multilayered, particularized, and discretionary. Their motion therefore fails to demonstrate that LARA's license suspension procedures implicate "a common mode of exercising discretion." *Dukes*, 564 U.S. at 357.

Typicality

"The prerequisite of typicality requires that a 'sufficient relationship exist[ ] between the injury to the named plaintiff and conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). Although the named plaintiffs' claims "must fairly encompass the class members' claim, they need not always involve the same facts or law." *Bobbitt v. Academy of Court Reporting*, Inc., 252 F.R.D. 327, 339 (E.D. Mich. 2008) (citing *Sprague v. GMC*, 133 F.3d 388, 399 (6th Cir. 1998)).

This class most obviously lacks typicality because only one of the four named plaintiffs signed a monitoring agreement. Indeed, the class's inclusion of both those who signed monitoring agreements and those who were reported as non-compliant is problematic because each group will have different litigation goals based on its

particular circumstances. There may be similarities between all HPRP participants, but this does not prove a "collective nature" to the challenged conduct. Further, although the parties dispute the percentage, the majority of HPRP participants have not left the program prematurely.[1] Plaintiffs are thus atypical.

The subclass also lacks typicality. LARA suspended the licenses of HPRP non-compliant participants at different stages of their treatment and for different reasons. The licensees suffered from different alleged disabilities and held different licenses that implicated different public safety concerns. Some, such as three of the named plaintiffs, had their licenses reinstated upon administrative appeal. Others, such as Lucas, have yet to get their licenses back.

"A class representative must be part of the class and possess the same interests and suffer the same injury as the class members." *East Tex. Motor Freight Systems, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). The disparity among the named plaintiffs, and between the named plaintiffs and the proposed class, is not merely a glitch in this case. The widely divergent circumstances of the named plaintiffs get to the core problem with Plaintiff's motion, that each individual plaintiff's claims depend on unique individual circumstances that demand their own proof and their own analysis, not only as to damages, but as to whether liability exists and where.

---

[1] Defendants cite statistics that 75 percent of HPRP participants successfully complete the program. (Dkt. 97-4 ¶ 25). Plaintiffs, however, take issue with this percentage's inclusion of current enrollees in the HPRP.

## CONCLUSION

Plaintiffs are attempting to group together in a class hundreds of medical practitioners whose licenses were suspended by separate analyses of their job duties, disabilities, types of noncompliance, medical history, and other unique contingencies. Such a class would run afoul of the commonality and typicality requirements of Rule 23(a), and the Court need not reach the Rule 23(b) analysis.

Accordingly,

**IT IS ORDERED** that the Plaintiff's Motion for Class Certification [73] is **DENIED**.

**SO ORDERED**.

Dated: December 6, 2018

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge